[No. 30521. Department One. July 15, 1948.]

S. S. NEELEY *et al., Respondents,* v. C. F. MAURER *· et al., Appellants.*[1]

*Ralph Purvis,* for appellants.

*Bryan & Merkel,* for respondents.

SIMPSON, J.—Plaintiffs instituted this action to clear title to, and fix the boundary line of, real property owned by them. The complaint described the property by metes and bounds and as the vacated portion of the replat of Port Orchard City; that plaintiffs, at the time of acquiring the property, September 25, 1925, replaced a certain fence on

[1]Reported in 195 P. (2d) 628.

the southern portion of the property, and since that time have been in open, notorious, and hostile possession of the property enclosed by the fence. It was further alleged that the defendants, since sometime in 1944, have interfered with the fence by removing portions of it, and thereafter encroached upon plaintiffs' property. Answering the complaint, the defendants alleged that plaintiffs had wrongfully erected the fence on defendants' land, and had not secured title by adverse possession. Plaintiffs and defendants asked the court to determine the true property line.

The cause, tried to the court, resulted in a judgment in favor of plaintiffs. Defendants then appealed to this court.

Appellants assign error in the admission of evidence, in the admission of one exhibit, the approval of a survey, and in finding that plaintiffs have acquired title by adverse possession to the line of the fence.

The facts, as disclosed by the evidence, are so well stated by the trial court in its memorandum opinion that we adopt its statement as follows:

"We have the evidence that in 1894, Mr. Dickinson, an engineer, surveyed this property and he put in stakes at the various corners. About the same time or a little later, he platted the property—made out this plat—and there seems to be some inconsistency between the survey of the tract which included the plat, and the survey of the plat, itself. Nobody has said, that I recall, that they have been able to actually identify any of the stakes showing the lots, streets, and blocks of the plat; but, in 1910, Mr. Berry in company with Mr. Dickinson, did definitely locate, according to his testimony, the stakes bounded by the corner markings which Mr. Dickinson put in there to mark these corners, as established by him in 1894. They accepted those. And then, finally, Kirkman and Hanks got the property and they had it surveyed. . . . again, Mr. Berry comes out there and Mr. Hanks comes out there and they both definitely state that those same stakes were there in 1908 that were there in 1894. And again in 1910 and again in 1925, they were . . . on the ground. Now, this plat has never actually become a plat. I mean by that, on the ground, itself. No streets have been laid out, no alleys, no lots, no blocks. It is still mainly in the condition it was at the time it was platted in 1894. But those surveyor's stakes

were there from 1894 to 1908 to 1910 to 1925. Then, when Hanks sold to Neeley, he took Neeley out and showed him these stakes. And in accordance with that survey made in 1925 and in accordance with the corners that were pointed out to him, Mr. Neeley then put up a fence to mark his line. I don't think it makes a difference whether the whole piece was closed or not, but the testimony is that it was enclosed but Mr. Neeley's testimony and definitely, Mrs. Neeley testified, and this other gentleman, Mr. Ford, said when he went there in '34, this fence that marked the boundary line between Mr. Neeley and Mr. Maurer, was there. It was closed to all intents and purposes, except the east line to the top of the bluff. Neeley said he originally did put a fence there, but thought no fence was needed because the bluff was a barrier, itself. The bluff was there. The county moved over the road. The corner stake was there, then, definitely. This fence on this particular line was put in there in 1926, and remained there and is there today, or was there in 1934, when the Maurers bought the property. They had actual knowledge that this fence was there for some purpose. Mr. Neeley said he herded stock until 1936 or so. Mr. Ford said he didn't see any stock since 1934 when he took a lease on it. But, in any event, the fence was there. The thing that marks the line was there, or at least, it was put there for some purpose. And the testimony was quite definite that Mr. Neeley was very careful to have this line pointed out to him and he and his wife and Mr. Berry and Mr. Ford stated positively that that fence was put in between these two stakes. It could have only been put there for one purpose,—to mark the line—of course, to keep in stock, too, but primarily to mark the line. It remained there—was there when the present owners bought the property to the south."

The conclusion of the trial court that respondents were entitled to the land that was included within the boundaries of the old stakes, is in keeping with the following statement appearing in 6 Thompson on Real Property (perm. ed.) 584, § 3378:

"Where a plat delineates an actual survey, the survey rather than the plat fixes the location and the boundaries of the land. The plat is a picture, the survey the substance. In a conveyance referring to such plat, the lot bounded by the lines actually run upon the ground is the lot intended to be conveyed. The plat may be all wrong, but that does

not matter if the actual survey can be shown. Thus, where there is a dispute as to the boundary line between a street and the abutting lots, the original survey will control the recorded plat. Where a surveyor of the land marks the division lines on the ground by monuments, such lines control calls and distances indicated on his map."

The rule of law applicable to a situation such as we have before us is so well stated in *Weidlich v. Independent Asphalt Paving Co.*, 94 Wash. 395, 162 Pac. 541, and the case is so similar as to the facts, that we quote from the opinion:

"The evidence of the engineer who made the original survey of the plat of Port Orchard City shows, *prima facie*, that many of the original stakes set by him at the corners of blocks, showing the numbers of the blocks, still stand in the original locations, and that others were found lying on the ground at the places where he originally located them. The evidence of another engineer was to the same effect, and of this other engineer that he proceeded to re-establish those corners of the blocks which were lost by reference to the stakes at the corners of blocks which were not lost, and thus located the exact boundaries of the various blocks and of the streets. These engineers thus located on the ground the location of Allison street between the blocks owned by these parties, and if Allison street as platted coincides with Allison street on the ground as located by these engineers, that is the true location of Allison street, and the center of that street, which is sixty feet wide, would be the present boundary line of the tracts owned by these respective parties, lying on either side thereof. Whether the blocks and streets as platted with reference to government monuments and official surveys will coincide with the staking or location of the blocks, and consequently the streets between the same, is another disputed question which should be determined. If they do coincide, it is conclusive. If they do not coincide and the parties bought with reference to the stakes upon the ground at the time they bought, they are bound thereby. *Turner v. Creech*, 58 Wash. 439, 108 Pac. 1084; *Campbell v. Seattle*, 59 Wash. 612, 110 Pac. 546; *Yarrow Land Co. v. Ross*, 79 Wash. 101, 139 Pac. 876; *Stokes v. Curtis*, 49 Wash. 235, 94 Pac. 1083."

It will be understood that the foregoing quotation is not adopted because it refers to the same replat under consid-

eration in this case. We simply apply it to the present case because it is in all respects in point.

The judgment of the trial court was correct, and it is therefore affirmed.

MALLERY, C. J., MILLARD, SCHWELLENBACH, and HILL, JJ., concur.