[No. 30752. Department Two. August 17, 1949.]

C. C. BOOTEN *et al.*, *Appellants*, v. NELLIE PETERSON
*et al.*, *Respondents.*[1]

*J. W. Graham,* for appellants.

*Metzger, Blair, Gardner & Boldt,* for respondents.

ROBINSON, J.—This appeal is from a judgment entered in an action of the type authorized by the Legislative Assembly of Washington Territory in 1886 (Laws of 1886, p. 104) and currently codified as Rem. Rev. Stat., §§ 947, 948, and 949 [P.P.C. §§ 13-1, -3, -5].

[1]Reported in 209 P. (2d) 349.

Section 947 provides, in substance, that whenever the boundaries between lands of two or more adjoining proprietors have been lost or, by time, accident, or any other cause, have become obscure or uncertain, and the adjoining proprietors cannot agree to establish the same, one or more of them may bring an action in equity in the superior court of the county in which the lands, or part of them, are situated, and the superior court, as a court of equity, may order such lost or uncertain boundaries to be erected and established and properly marked.

It is further provided, in § 948, that the court, in its discretion, may, in such an action, appoint commissioners, not exceeding three competent and disinterested persons, one or more of whom shall be practical surveyors, residents of the state, to survey, erect, establish, and properly mark such boundaries and return to the court a plat of their survey and the field notes thereof, together with their report, and the report shall be advisory and subject to exception by either party in the cause, in the same manner as exceptions are taken to reports of referees.

It is also provided, in § 949, that the proceedings shall be conducted as in other civil actions, and that the court shall apportion the costs thereof equitably between the parties thereto, and that, when so apportioned, the cost shall be a lien upon the lands severally.

All the lands involved in this cause are situated in Mason county, and their boundaries were, at one time, indicated in an unrecorded plat known as the plat of "Happy Hollow Tracts," which plat included all of government lot 3 of section 22, township 22 north, range 2 W. W. M.

All the lands involved are within government lot 3, which is bounded on the north by Hood Canal. At a comparatively short distance south of the meander line between Hood Canal and government lot 3, the Navy Yard highway (State Road No. 14) crosses lot 3. Beginning at the west line of lot 3 and proceeding easterly, the lands between the highway and the meander line were platted into tracts one hundred feet in width, numbered one to twelve, inclu-

sive, from west to east. The remainder of the land in lot 3, south of the highway, was also platted into tracts by extending the boundary lines of the waterfront tracts. It becomes impossible to present a satisfactory picture of the relative location of the various tracts involved by a merely narrative description. That being so, we insert, at this point, a rough sketch showing the relative positions in government lot 3 of the lands and boundaries involved.

The foregoing sketch is not inserted as being, in itself, proof of any specific fact but as a useful aid to an understanding of the various contentions made by the parties to this appeal. We are here primarily concerned with the proper location of the boundary line between waterfront tracts Nos. 8 and 9, as shown in the foregoing sketch of government lot 3, and secondarily, with the proper location of that line as extended south of the Navy Yard highway. The whole of government lot 3 became the property of J. A. Hoshor and wife in October, 1908.

In December, 1921, the Hoshors conveyed to Alberta E. Gifford a certain portion of lot 3, and tide lands adjacent thereto, employing the following description:

"The West 100 feet of the East 520 feet of Government Lot 3, Section 22, Township 22 North, Range 2 West, W. M., lying North of the North line of the Navy Yard Highway as the same is now extended over and across said Lot 3, said land being known also as Tract No. 8 of the Unrecorded Plat of Happy Hollow Tracts, Mason County, Washington.

"Also tide lands of the second-class lying in front of the above described upland as deeded by the State of Washington to J. A. Hoshor by deed dated August 23, 1910, and recorded in Volume 9 O. L., on page 130, Mason County records, subject to the provisions contained in said deed from the State of Washington."

Primarily, it would seem to be the purpose of the Hoshors' deed to convey to the Giffords the west 100 feet of the east 520 feet of government lot 3, and so forth, although it is further stated that the land so conveyed was also known as tract No. 8 of the unrecorded plat of Happy Hollow Tracts.

In September, 1923, the Giffords conveyed the property they had received from the Hoshors in December, 1921, to William Loring and wife, employing the same description which the Hoshors had used in deeding the property to them. In February, 1946, the Lorings, employing the original Hoshor description, conveyed the property to James and Kathleen McCallum. In May, 1947, McCallum and wife, using the same description conveyed it to the plaintiffs.

Therefore, there can be no doubt but that the plaintiffs have fee simple title to that portion of the west 100 feet of the east 520 feet of government lot 3, section 22, township 22 north, range 2 W., W. M., lying north of the north line of the Navy Yard highway. That part of the description, standing alone, is very definite and completely adequate, since it furnishes the means by which the land conveyed can be located and identified. Hood Canal and the Navy Yard highway are, of course, permanent markers, and it is in evidence that the field notes of the original government survey of lot 3 are available, and the east line of government lot 3 can, therefore, readily be found. The added statement, "said land being known also as Tract No. 8 of the Unrecorded Plat of Happy Hollow Tracts, Mason County, Washington," is of no value in locating the boundaries of the land conveyed, since that plat was never recorded, and for aught we know is not even in existence.

In Skelton, Boundaries and Adjacent Properties, p. 3, art. 2, § 2, under the subtitle "Deed Descriptions," it is said:

"A description by which the property may be identified by a competent surveyor with reasonable certainty, either with or without the aid of extrinsic evidence, is sufficient, for the office of a description is not to identify but to furnish a means of identification, and any description is sufficient by which the identity of the premises can be established."

In support of that statement, the author cites the opinion of this court in *Sengfelder v. Hill,* 21 Wash. 371, 58 Pac. 250, in which the court quoted the following from an Indiana case (*Rucker v. Steelman,* 73 Ind. 396):

" 'It is not the office of a description to identify the premises, but to furnish the means by which they can be identified.' "

In its opinion in *Sengfelder v. Hill, supra,* the court also quoted the following from an Illinois decision (*Smiley v. Fries,* 104 Ill. 416):

" 'This court has ruled that any description by which the property might be identified by a competent surveyor with reasonable certainty, either with or without the aid of extrinsic evidence, is sufficient.' "

The defendant Nellie Peterson's title to the land adjoining plaintiffs' land derives from a warranty deed from the Hoshors, executed on August 27, 1921, to N. E. Peterson and Nellie Peterson, his wife. On June 23, 1937, N. E. Peterson quitclaimed the same property to his wife, using the same description which the Hoshors had used in their deed to the Petersons of August 27, 1921. That description read as follows:

"The West 100 feet of the East 420 feet of Government Lot 3, Section 22, Township 22 North, Range 2 West, W. M., lying North of the North line of the Navy Yard Highway as the same is now extended over and across said Lot 3; said land being also known as Tract No. 9 of the Unrecorded Plat of Happy Hollow Tracts, Mason County, Washington."

As we have hitherto noted, in deeding the property now owned by the plaintiffs to the first of the plaintiffs predecessors in title, the Hoshors described it as follows:

"The West 100 feet of the East 520 feet of Government Lot 3, Section 22, Township 22 North, Range 2 West, W. M., lying North of the North line of the Navy Yard Highway as the same is now extended over and across said Lot 3, . . ."

It is, therefore, apparent, from the above-quoted descriptions originated by the common grantors, that the west line of the Peterson property and the east line of the Booten property must coincide, and also that that line was, and is, parallel to and 420 feet west of the east boundary of government lot 3, and furthermore that, since the east boundary of government lot 3 can be easily located, it would be an easy task for a surveyor to locate and mark the line between the property of the Bootens and that of Mrs. Peterson.

In their complaint, the plaintiffs not only alleged ownership of that portion of the west 100 feet of the east 520 feet of government lot 3, and so forth, lying north of the Navy Yard highway, and the tide lands in front thereof, but also that portion of the west 100 feet of the east 520 feet of government lot 3, and so forth, lying south of the Navy Yard highway. They further alleged that Nellie Peterson owned the west 100 feet of the east 420 feet of government lot 3,

and so forth, lying above the Navy Yard highway, and that the west line of her property coincided with the east line of theirs. They further alleged that they owned that portion of the west 100 feet of the east 420 feet of government lot 3, and so forth, lying south of the Navy Yard highway, and that the Johnsons and the Laytons owned the 100 foot strip of property adjoining them on the east.

Plaintiffs further alleged that the lines between their property and the defendants' property, both above and below the Navy Yard highway, had become uncertain, and that they could not agree with the defendants as to the proper location of their common boundaries. They further alleged that, within the last preceding thirty days, the Petersons had caused a fence to be erected on the plaintiffs' premises.

Plaintiffs prayed that a commission be appointed by the court, as authorized by Rem. Rev. Stat., § 948, to determine the location of the boundary line between their lands and the Petersons' lands and the lands of the Johnsons and the Laytons.

In their answer and cross-complaint, the Petersons admitted the plaintiffs' allegations as to the ownership of the various parcels of land mentioned in the complaint, and that the west line of the defendants' property coincided with the east line of the plaintiffs' property, but denied that those boundaries had become uncertain and that the parties had been unable to agree as to the proper location thereof; and particularly denied that they had erected a fence on the plaintiffs' premises, as alleged in the plaintiffs' complaint, but alleged that they did cause a fence to be erected on the true boundary line between the properties. By way of cross-complaint, the Petersons alleged:

"That for more than twenty-five years prior hereto, the defendant Nellie Peterson and her husband, N. E. Peterson, have been the owners of and in the continuous possession of the property described in Paragraph II of the plaintiffs' complaint, holding and occupying the same under claim of title up to the line marked by the fence erected by the defendant Nellie Peterson as alleged in Paragraph V of the

complaint, which fence is on the line pointed out by the common grantor of all the properties described in the plaintiffs' complaint as the west line of said defendant's property; that said possession has been under claim of title, to-wit, by virtue of deed duly recorded in the office of the Auditor of Mason County, Washington, on September 3, 1921, at page 470, Volume 31 of Deed Records, and has been open, notorious, exclusive, peaceable and adverse to all third parties and particularly to the plaintiffs and their predecessors in interest.

"That the defendants Carl H. Johnson and Jennie Johnson, his wife, and Raymond W. Layton and Bertha L. Layton, his wife, and their predecessors in interest have been the owners and in the continuous possession of the property described in Paragraph IV of the plaintiffs' complaint for more than twenty years prior to the service of the complaint, holding and claiming the same up to a line which is an extension southerly of the line marked by the fence erected by the defendant Nellie Peterson, as alleged in Paragraph V of the complaint; that their ownership and possession of said property has been under claim of title made in good faith; that they have paid all taxes levied upon said land in each of more than seven years last past."

All the defendants prayed that their title be quieted up to the lines referred to in their affirmative defenses, and that the plaintiffs be perpetually enjoined from interfering with such lands or claiming or asserting any right, title or interest in any portion of the lands lying east of those lines. Plaintiffs filed a reply denying the affirmative allegations in the defendants' cross-complaint.

At the end of a fairly long and somewhat tedious trial, the court delivered the following oral decision:

"The Court is of the opinion that the evidence established adverse possession in the Defendant Peterson which, right or wrong, so far as the original survey was concerned, ripened into perfect title long before the purchase by Booten, the Plaintiff.

"An order may be taken in accordance herewith."

On July 3, 1948, the trial court entered a decree in which it was ordered that the plaintiffs' complaint be dismissed with prejudice, and adjudged that Nellie Peterson was the owner of that property described in the deed from the

Hoshors to her husband and herself on August 27, 1921, as follows:

"The West 100 feet of the East 420 feet of Government Lot 3, Section 22, Township 22 North, Range 2 West, W. M., lying North of the North line of the Navy Yard Highway as the same is now extended over and across said Lot 3; said land being also known as Tract No. 9 of the Unrecorded Plat of Happy Hollow Tracts, Mason County, Washington.

"Also all tide lands of the second-class lying in front of the above described upland as deeded by the State of Washington to J. A. Hoshor by deed dated August 23, 1910, and recorded in Volume 9 O. L., on page 130, Mason County Records, subject to the provisions contained in said deed from the State of Washington,"

and that the plaintiffs, Booten and wife, are the owners of the tract of real property adjoining the Petersons' property on the west, the description of which has been heretofore set out in full in this opinion, and that the boundary line between the tract of real property owned by Nellie Peterson and the tract owned by the plaintiffs, Booten, was, and hereby is, established by adverse possession, as follows:

"A line heretofore and now marked upon the ground by three (3) blazed fir trees, planted laurel bushes, a single strand barbed wire fence, an iron pipe stake at or near the north end of said boundary line and an iron pipe stake at or near the south end of said boundary line; said boundary line being a north and south line distant 164' 3" west of the United States Coast and Geodetic Survey Triangulation Station Granite 2, which station is marked by a concrete monument approximately 11" x 11" rising about 8" above the ground, inset with an official brass marker inscribe, 'U.S. Coast & Geodetic Survey Triangulation Station. For information, write to The Director, Washington, D. C. $250.00 fine or imprisonment for disturbing this marker.'"

The decree also perpetually enjoined the plaintiffs from interfering with the land of defendant Nellie Peterson, "or claiming or asserting any right, title or interest in any portion of said land lying east of the boundary line as established herein."

Plaintiffs promptly gave notice of appeal from the decree, filed a cost bond, and, in due course, filed the record in this court.

We think it unnecessary to deal, in this opinion, with the controversy between the appellants and the respondents, Johnsons and Laytons, with regard to the boundary lines south of the Navy Yard highway. During the pendency of this appeal, the respondents moved to dismiss the appeal. One of the grounds advanced in support of that motion was that the cost bond was defective, in that it ran only to Nellie Peterson, and that the Johnsons and the Laytons were not named as obligees. In resisting that motion, the appellants said, in their briefs:

"The judgment was in favor of Nellie Peterson only, and fixed the line between her property and that of the plaintiffs where contended for by Nellie Peterson, on the basis of adverse possession. The defendants Johnson and Layton, in their cross-complaint claimed that the Peterson line extended south across the highway and following the same line across their property represented their property line, also claimed by adverse possession. The court refused to entertain that claim. Rejected it and entered judgment in favor of Nellie Peterson only. The so-called dismissal involved the dismissal of the Johnson and Layton cross-complaint. Johnson and Layton did not appeal or cross-appeal. They therefore are out of the picture. They could have no interest in this appeal. Neither its reversal nor affirmation would affect their rights. This court has frequently held that unless a party has been aggrieved or his rights prejudiced by the decision, he has no interest in an appeal. Had they appealed from the refusal of the court to establish their line as claimed by them, a different situation would exist."

In their appeal briefs, the respondents Carl H. Johnson and Jennie Johnson and Raymond W. Layton and Bertha L. Layton, through their counsel, moved the court that this appeal be dismissed as to each of them, for the reason that they had no interest therein. The motion was orally renewed and argued at the hearing before us. We agree that the Johnsons and Laytons have no real interest in this appeal. As appellants' counsel said, in his brief, above quoted, resisting the motion to dismiss the appeal, "Neither

its reversal nor affirmation would affect their rights," and, in our opinion, the motion made on behalf of the Johnsons and Laytons should be granted. It is so ordered.

■ The appeal itself cannot be so summarily disposed of. The decree appealed from is a very drastic one. The appellants insist that it should be reversed and set aside, and the trial court instructed to appoint a commission, as provided for in § 948, but that section of the code opens with the following statement:

"Said court may, in its discretion, appoint commissioners, . . ."

Moreover, it is provided, in the same section, that the report of such commissioners shall be advisory only.

We are inclined to the view that the court might well have appointed a commission to determine the boundary line between the plaintiffs' property and that of Nellie Peterson. The trial judge, however, took the view that that line had been established by adverse possession, and although we do not share that view, we feel that we cannot say that his refusal to appoint a commission constituted an abuse of his discretion.

The respondents vigorously contend that the decree should in all respects be affirmed, for several reasons: (1) They contend that the evidence amply shows that the true line between the plaintiffs' property and the Petersons' property was established by adverse possession, at the exact location decreed by the trial court.

■ We think that the evidence relied on as showing adverse possession was very weak, particularly since it was not disputed that the actual land which the decree adjudges the Petersons acquired by adverse possession, was unfenced and covered with brush and small trees. See *State ex rel. Shorett v. Blue Ridge Club*, 22 Wn. (2d) 487, 156 P. (2d) 667.

There is evidence, however, that, some time in the early twenties, the Petersons cleared away some of the brush and laid out a croquet court, which they used for a number of years. This was near the waterfront and within five or

thirty feet from the high tide line, and the cleared space extended westerly up to the line which the Petersons now claim and the court found to be the true boundary. If, in laying out their croquet court, the Petersons, in order to have sufficient space, got over the true boundary a few feet into the Bootens' land, is it to be held that they did so with hostile intent? Or was that act merely a somewhat insignificant trespass? We quote from *Peoples Savings Bank v. Bufford*, 90 Wash. 204, 206-207, 155 Pac. 1068:

"But it is not every possession that will start the running of the statute. There is a presumption attending always that one who enters into the possession of the property of another enters with the permission of the true owner, and holds in subordination to his title. The statute begins to run from the date of possession only when it is sustained by a hostile intent to claim adversely, or, where possession is taken by mistake, the intruder exercises such dominion over the property as to put the true owner upon notice of the hostile claim. As is said in the books:

" 'The disseisor "must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest." ' 1 R. C. L. 693.

"In other words, a title by adverse possession, where land is claimed under mistake, 'cannot be decided as a matter of law, without resort to the facts of the particular case.' *Johnson v. Ingram*, 63 Wash. 554, 115 Pac. 1073. The claim must be followed by acts which clearly evince a determination of permanent ownership. *Bowers v. Ledgerwood*, 25 Wash. 14, 64 Pac. 936. . . .

"The presumption that one entering upon the property of another does so in subordination to the title of the real owner is a valuable right of property. The disseisor is put to the burden of proof. (*Skansi v. Novak*, 84 Wash. 39, 146 Pac. 160) and *the title is not to be overcome by evidence of entry and occupation alone*, but the hostile intent must be clearly demonstrated, that is to say:

" ' "Regard must be had to the nature or quality of the acts, and to the situation of the property, as well as to the theory upon which the doctrine of adverse possession rests . . . ."

" 'The circumstances of possession must be of such nature as to preclude a conclusion that the owner was misled by

facts from which he might reasonably have supposed a mere trespass had been or was being committed, instead of the assertion of a claim of right. The acts of the invader are sufficient if they clearly show actual appropriation to his permanent and exclusive dominion and benefit; but they must visibly indicate intention of permanent occupation and appropriation. Actual residence on the land, however, is not necessary.' *Sinclair v. Matter*, 125 Minn. 484, 147 N. W. 655." (Italics ours.)

A disseisor "must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest." We are of the opinion that the Petersons' encroachment on the plaintiffs' land, in order to increase the area of their croquet court, was not much of a "flag," and we find no evidence whatever which indicates that they did so with hostile intent.

We do know, however, that Mr. Booten testified, at the outset of the trial, that some little time after he bought his land, he had a talk with Mr. Peterson in which Peterson pointed out a line between their properties which, if correct, would deprive him (Booten) of a considerable portion of what he claimed to be his property. He further testified:

"A. He took me down and showed me what he figured was the east line at the waterfront. He took me up to the road and tried to find a stake showing me the line at the road, but at that time he was unable to locate the stake, but later on, later on I believe it was the next day, he did show me a stake at the road. If that being the line, it included about 50% of my property. Q. Now, did you go over the same ground the first day that you did the second day in looking for this stake? A. Yes sir. Q. And the stake was not visible at least the first day? A. That is right at the road, but was at the water edge or close to it. Q. What kind of a stake was it? A. It was a portion of galvanized pipe, I believe three-quarter inch galvanized. . . . Q. Did you and Mr. Peterson get together on anything at that time or agree on anything? A. Mr. Peterson made the statement that if it wasn't his land, he didn't want it and I told him if it wasn't mine, I didn't want it, but he said it would have to be settled in court to which I agreed. Q. Did he, after that, put in, put anything on your land along the line which he

claimed was the line? A. Yes sir. Q. What did they put in there? A. One barbed wire. Q. With posts and so forth? A. There is a post up at the road, but I didn't follow it all the way through. I think it is nailed mostly to trees zig-zagged around. Q. Did he claim that to be the proper line, or is that the line he had shown you? A. He claimed that to be the line."

It would seem that, at that time at least, Peterson's claim was based upon a marker and not on hostile adverse possession. It is our opinion that the trial court erred in holding that the boundary line between the plaintiffs' land and the Petersons' land was established by adverse possession.

In their attempt to support the decree appealed from, the respondents rely principally upon the common grantor rule, as heretofore recognized by this court in *Weidlich v. Independent Asphalt Paving Co.*, 94 Wash. 395, 162 Pac. 541, and cases therein cited, and quote extensively from more recent cases, particularly *Windsor v. Bourcier*, 21 Wn. (2d) 313, 150 P. (2d) 717; *Strom v. Arcorace*, 27 Wn. (2d) 478, 178 P. (2d) 959; *Thompson v. Bain*, 28 Wn. (2d) 590, 183 P. (2d) 785. We may interpolate that many more citations of cases dealing with the common grantor rule may be found in an article entitled "Boundary Disputes in Washington" by James R. Ellis, in the May 1948 edition of the Washington Law Review and State Bar Journal, Vol. 23, No. 2, p. 125.

In their pleadings, the respondents laid a foundation for an application of the rule, but there is nothing in the record indicating that the court's decision was in any respect based upon, or influenced by, it. As we have seen, its decree was based entirely upon adverse possession. In this connection, the respondents call our attention to the fact that this action is equitable in nature and that it is well settled in this jurisdiction that such a case is triable *de novo* on appeal.

Our attention is also called to the following holding in *Rosenthal v. Tacoma*, 31 Wn. (2d) 32, 195 P. (2d) 102:

"It is the rule in cases triable *de novo* that, if the decision of the trial court can soundly rest on any ground, it must be sustained."

█ With these rules as a background, it is vigorously contended that the decree of the trial court can and should be affirmed on the common grantor rule. We are unable to agree with that contention. This opinion has reached such a length that we cannot go into a detailed discussion of the evidence relied upon to support the respondents' contention as to that feature of the case.

The respondents vigorously contend that the evidence shows that the line fixed by the court is the exact line which was established by the Hoshors' plat of the property. This amounts to a contention that the language in the Hoshors' own deeds, following a definite and adequate description of the actual land conveyed thereby, is overridden by the added statement: "Said land being known also as Tract No. 8 [in the one instance]" and "Tract No. 9 [in the other] of the Unrecorded Plat of Happy Hollow Tracts, Mason County, Washington."

In our opinion, what might be called the "metes and bounds" descriptions in the deeds overrule the superfluous language last above quoted. It seems to be by far the most reliable information as to the location of the alleged lost boundary line.

The respondents, however, contend that the line established by the court in its decree as the common boundary between the Bootens' and the Petersons' lands is the exact line that was actually staked by the Hoshors in platting and selling the lands in government lot 3. The evidence that it is is not very convincing. Furthermore, the respondents admit, in their brief, that the Hoshors' stakings on the unrecorded plat of government lot 3 are not infallible. We quote briefly from respondents' brief:

"In approaching this case on the merits it helps to have in mind the chain of circumstances which led to this trouble. The trouble first started some years ago when it was found that Tract 1, Government Lot 3, was encroaching about 14 feet over into Government Lot 4 which adjoins Government Lot 3 on the west. Thereupon, several property owners at the west end of Government Lot 3 moved 14 feet east by agreement and reformed their deeds to read from the west line of Government Lot 3."

In other words, the Hoshors' stakes as to tract No. 1 of government lot 3 enclosed a portion of government lot 2, which the Hoshors did not own. In our opinion, the descriptions made with reference to the east boundary line of government lot 3 by the Hoshors in their deeds, are much more likely to reveal the true boundary between the land of the plaintiffs and Mrs. Peterson than the Hoshors' staking of tracts Nos. 8 and 9 on the unrecorded plat of government lot 3.

The decree appealed from is reversed and a new trial granted in so far as respondent Nellie Peterson is concerned. Having dismissed the appeal as to the Johnsons and the Laytons, we affirm the judgment of the trial court granted in their favor.

JEFFERS, SCHWELLENBACH, and GRADY, JJ., concur.

SIMPSON, C. J., concurs in the result.